AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>See Attachment A | )<br>)<br>)<br>)<br>)<br>) | Case No. 19-903-M |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ Eastern _____ District of _____ Pennsylvania _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 841 and 846 | possession with intent to distribute controlled substances; and, conspiracy to possession with intent to distribute controlled substances |

The application is based on these facts:

See Attachment C.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Travis W. Campbell, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/22/2019

City and state: Philadelphia, Pennsylvania

Hon. Linda K. Caracappa, U.S. Magistrate Judge
*Printed name and title*

*Judge's signature*

## ATTACHMENT A

One (1) LG cellular phone with IMEI 357093098284890 (SUBJECT PHONE 1), previously assigned telephone number (201) 737-8815, and currently in the custody of the DEA Philadelphia Field Division;

One (1) Samsung cellular phone with IMEI 352938094174658 (SUBJECT PHONE 2), previously assigned telephone number (917) 564-1603, and currently in the custody of the DEA Philadelphia Field Division;

One (1) Samsung cellular phone with IMEI 352475101467015 (SUBJECT PHONE 3), assigned telephone number (516) 595-5845, and currently in the custody of the DEA Philadelphia Field Division;

One (1) Samsung cellular phone with IMEI 352475105098311 (SUBJECT PHONE 4), previously assigned telephone number (347) 589-7319, and currently in the custody of the DEA Philadelphia Field Division;

One (1) LG cellular phone with IMEI 351980092660115 (SUBJECT PHONE 5), previously assigned telephone number (917) 635-6474, and currently in the custody of the DEA Philadelphia Field Division;

One (1) Samsung cellular phone with IMEI 352475100871837 (SUBJECT PHONE 6), previously assigned telephone number (631) 402-7475, and currently in the custody of the DEA Philadelphia Field Division; and,

One (1) LG cellular phone with IMEI 354209093861432 (SUBJECT PHONE 7), previously assigned telephone number (718) 772-8635, and currently in the custody of the DEA Philadelphia Field Division.

## ATTACHMENT B

All items listed in Attachment A may be searched for evidence of the following violations: conspiracy to distribute and possess with intent to distribute a controlled substance in violation of Title 21, United States Code, Sections 846 and 841(a)(1); possession with intent to distribute a controlled substance in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(A); and conspiracy to launder monetary instruments in violation of Title 18, United States Code, Section 1956(h), involving Israel COLLADO-REYES, FNU LNU, a/k/a "WILLY", Jose LOPEZ-ESPINAL, Ysmael ORTEGA-SEVERINO, Rafael CUSTODIO, Bernardo DIAZ DE LA CRUZ, Aneudy OTANEZ, and others members and associates of drug trafficking organization, including:

    a.    Electronic communications relating to the criminal activity,

    b.    Telephone or address directory entries consisting of names, addresses, telephone numbers; logs of telephone numbers dialed, telephone numbers of incoming, outgoing or missed calls, text messages, schedule entries, stored memoranda, videos, social networking sites and digital photographs,

    c.    Lists of customers and related identifying information,

    d.    Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions,

    e.    Any information related to sources of controlled substances, including names, addresses phone numbers, and any other identifying information,

    f.    Any information related to the methods of trafficking in controlled substances;

    g.    Any information recording domestic and international schedule or travel related to the described criminal activity, including any information recording a nexus to airport facilities, airport security, or airlines,

2

h.    All bank records, checks, credit cards, credit card bills, account information, and other financial records,

i.    Any information related to package delivery services, including but not limited to United States Postal Service, Federal Express and UPS,

j.    All data that has been manually programmed into a GPS navigation system, as well as data automatically stored by the GPS navigation system,

k.    Stored memoranda; stored text messages; stored electronic mail; stored photographs; stored audio; and stored video,

l.    Evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software,

m.    Evidence of the attachment of other devices,

n.    Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device,

o.    Evidence of the times the device was used,

p.    Passwords, encryption keys, and other access devices that may be necessary to access any of the devices,

q.    Records of or information about Internet Protocol addresses used by the device,

r.    Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "Favorite" web pages, search terms that the user entered into any Internet search engine, and records or user-typed web addresses, as well as evidence of the posting of videos, photos, or any material relevant to these crimes to any social networking site (such as Facebook messenger, Whatsapp, Tango).

s.    Evidence of user attribution showing who used or owned the electronic devices at the time the things described above were created, edited, or deleted, such as logs phonebooks, saved usernames and passwords, documents, and browsing history.

4

**ATTACHMENT C**

**AFFIDAVIT**

I, Travis W. Campbell, being duly sworn, depose and say:

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since April 2015.   In October 2015, I was assigned to the DEA Philadelphia Field Division.   Prior to my employment with the DEA, I was a Special Agent with the North Carolina State Bureau of Investigation/Alcohol Law Enforcement for approximately 5 years.

2.      I have specialized training and experience in drug smuggling and distribution investigations, including but not limited to, the means and methods used by traffickers to import and distribute controlled substances, interdiction, smuggling methods, and the concealment and laundering of proceeds from illegal drug trafficking activities.   I have participated in numerous narcotics investigations, debriefed or participated in debriefings of hundreds of defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations, and have participated in all aspects of drug investigations, including conducting physical surveillance, analyzing information obtained from court-ordered pen register and trap and trace intercepts, and analyzing telephone toll information obtained as a result of subpoenas issued by the DEA.   I have been the affiant in numerous wiretap investigations and also assisted in monitoring the wiretap communications.   My training and experience have made me familiar with illegal drug trafficking and the packaging and shipping of controlled substances including heroin, cocaine, fentanyl, cocaine base ("crack"), methamphetamine, and marijuana.   My narcotics training and experience have made me familiar with the methods of illegal trafficking,

packaging and shipping of the following controlled substances: methamphetamine, cocaine, cocaine base, heroin, fentanyl, and marijuana.

3.     Based on my training and experience and the training and experience of other agents, I know that individuals involved in drug trafficking often maintain more than one phone or more than one SIM card device, in order to have multiple avenues to facilitate drug trafficking activities, and in an attempt to avoid detection by law enforcement.    I am aware that individuals involved in drug trafficking often times utilize pre-paid cellular telephones which do not maintain specific subscriber information, and/or use phones subscribed to in the name of third person, in order to mask their direct linkage to telephones utilized in furtherance of drug trafficking activities.    Further, those involved in drug trafficking often change SIM cards in order to make it difficult for law enforcement to determine their records.    Based on my training and experience, as well as the training and experience of other agents, I know that individuals involved in drug trafficking also frequently switch telephone numbers and/or phones.    Despite the constant switching of active telephone numbers, those involved with drug trafficking and often keep old phones.

4.     Based on my training and experience and the training and experience of other agents, I am aware that data stored on electronic devices can remain for a long time. Furthermore, I am also aware that newer phones can store and contain data from several years ago, for instance if an individual uses a social media or messaging application, that stores data from several years ago (such as Facebook messenger, Whatsapp, Tango).    In addition, I am aware that some data, such as contacts, photographs, and text messages, can be transferred from old phones to new phones, either manually or by transferring a SIM card device that has the data

6

on it.  It is therefore reasonable to believe that the phones recovered from COLLADO-REYES

may have data stored from his interactions with co-conspirators during the course of the charged

conspiracy, or may have older communications from social media sites stored on the phone.

5.     Based on my training and experience, I know that those involved with drug

trafficking commonly utilize their cellular telephones to communicate with co-conspirators to

facilitate, plan, and execute their drug transactions.  For example, I know that drug traffickers

often store contacts lists, address books, calendars, photographs, videos, and audio files, text

messages, call logs, and voice mails in their electronic devices, such as cellular telephones, to be

used in furtherance of their drug trafficking activities.

6.     Specifically, I know that those involved in drug trafficking communicate with

associates using cellular telephones to make telephone calls.  If they are unable to reach the

party called, they frequently leave voice mail messages. I am aware that Apple-based and

Android-based phones download voice mail messages and store them on the phone itself so that

there is no need for the user to call in to a number at a remote location and listen to the message.

In addition, I know those involved in drug trafficking communicate with associates using cellular

telephones and tablets to send e-mails and text messages.  I know they also communicate with

associates via social media networking sites and through messaging options via social media

(e.g., Facebook messaging), or through other communication applications available to download

and use on phones, including but not limited to "Whatsapp," "Tango," and "Hangouts."  By

analyzing call and text/application communications, including any social media "chats" or

messaging application communications, I may be able to determine the identity of co-

7

conspirators and associated telephone numbers, as well as if there were communications between associates during the commission of the crimes.

7.      Furthermore, cellular telephones also contain address books with names, addresses, photographs, and phone numbers of a person's regular contacts.   I am aware that those involved with drug trafficking frequently list co-conspirators in directories, often by nickname, to avoid detection by others.   Such directories as the ones likely contained in the seized cellular telephones, are one of the few ways to verify the numbers (*i.e.*, telephones, pagers, etc.) being used by specific co-conspirators.

8.      In addition, I know that those involved with drug trafficking often take photographs or make videos of themselves and their co-conspirators and retain them on their electronic devices such as cellular telephones.   This evidence would show associations between accomplices, *i.e.* photographs of accomplices and/or individuals common to co-conspirators.   I am also aware that drug traffickers often take photographs or make videos of drugs and drug proceeds with their cellular telephones and tablets.   Based on my training and experience, those who commit these crimes often store these items on their phones in order to show to associates, and/or to upload to social media.

9.      Furthermore, based on my training and experience and the training and experience of other agents, I know that drug traffickers often use a cellular phone's Internet browser for web browsing activity related to their drug trafficking activities.   Specifically, those involved with drug trafficking may use an Internet search engine to explore where banks or mail delivery services are located, or may use the Internet to make reservations for drug-related travel.   In addition, I know that drug traffickers also use their cellular telephone's Internet browser to

8

update their social networking sites in order to communicate with co-conspirators, and to display drugs and drug proceeds or to post photographs of locations where they have traveled in furtherance of their criminal activities.

10.     In addition, drug traffickers sometimes use cellular telephones as navigation devices, obtaining maps and directions to various locations in furtherance of their criminal activities.   These electronic devices may also contain GPS navigation capabilities and related stored information that could identify where these devices were located.

11.     Furthermore, based on my training and experience, forensic evidence recovered from the review of a cellular telephone can also assist in establishing the identity of the user of the device, how the device was used, the purpose of its use, and when it was used.   In particular, I am aware that cellular telephones are all identifiable by unique numbers on each phone, including: serial numbers, international mobile equipment identification numbers (IMEI) and/or electronic serial numbers (ESN).   The search of each phone helps determine the telephone number assigned to each device, thus facilitating the identification of the phone as being used by members of the conspiracy.   In addition, I am aware that by using forensic tools, information/data that users have deleted may still be able to be recovered from the device.

12.     I make this affidavit in support of an application for a search warrant of the following cellular phones, as described in Attachment A: One (1) LG cellular phone with IMEI 357093098284890 (SUBJECT PHONE 1), previously assigned telephone number (201) 737-8815, and currently in the custody of the DEA Philadelphia Field Division; One (1) Samsung cellular phone with IMEI 352938094174658 (SUBJECT PHONE 2), previously assigned telephone number (917) 564-1603, and currently in the custody of the DEA Philadelphia Field

9

Division; One (1) Samsung cellular phone with IMEI 352475101467015 (SUBJECT PHONE 3),

assigned telephone number (516) 595-5845, and currently in the custody of the DEA

Philadelphia Field Division; One (1) Samsung cellular phone with IMEI 352475105098311

(SUBJECT PHONE 4), previously assigned telephone number (347) 589-7319, and currently in

the custody of the DEA Philadelphia Field Division; One (1) LG cellular phone with IMEI

351980092660115 (SUBJECT PHONE 5), previously assigned telephone number (917) 635-

6474, and currently in the custody of the DEA Philadelphia Field Division; One (1) Samsung

cellular phone with IMEI 352475100871837 (SUBJECT PHONE 6), previously assigned

telephone number (631) 402-7475, and currently in the custody of the DEA Philadelphia Field

Division; One (1) LG cellular phone with IMEI 354209093861432 (SUBJECT PHONE 7),

previously assigned telephone number (718) 772-8635, and currently in the custody of the DEA

Philadelphia Field Division.  SUBJECT PHONES 1 through 7 are collectively referred to as

SUBJECT PHONES hereinafter.  This application seeks authority to search for and seize

evidence, and fruit and instrumentalities of crimes against the United States, specifically in

violation of Title 21, United States Code, Sections 841, 846(a)(1) as described in Attachment B.

## ELECTRONIC DEVICES

13.   As described in Attachment B, this application seeks permission to search and

seize things that the above items might contain, in whatever form they are stored.  As used

herein, the term "electronic device" includes any electronic system or device capable of storing

or processing data in digital form, in this case referring specifically to wireless or cellular

telephones.

10

14. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices. In particular, I know that electronic devices, including cellular telephones used by drug traffickers, are likely to be repositories of evidence of crimes. I know that an electronic device such as a cellular telephone may contain data that is evidence of how the electronic device was used, data that was sent and received, and other records that may indicate the nature of the offense.

15. Furthermore, I know that electronic devices, such as cellular telephones, can store information for long periods of time. Examples of such information include, text and multimedia message conversations, call history, voice mail messages, e-mails, photographs, and other data stored on the device. Similarly, I know from my training and experience that when cellular telephones are used to access the internet, a browser history is also frequently stored for some period of time on the electronic device. This information can sometimes be recovered with forensic tools.

16. Based on my experience and training, as well as the experience and training of other agents, I know that even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Further, based on my experience and training, I know that other than the conventional mechanical hard drives that are traditionally in computers, becoming more prevalent are flash memory-based hard drives and devices. This technology has been traditionally used for small thumb drives where files and data are stored electronically, but has since evolved and is being used in computer hard drives known as "solid state hard drives" or SSD's and also being used in cell phones and smart phones. These devices do not operate like

11

mechanical hard drives when it comes to how files and data are stored and deleted.  These

devices can move data around on the drive to maximize storage space and longevity of the drive,

compress data, and may use different deletion techniques for how a deleted file is handled and

overwritten.  The manner in which these devices function may limit how much data, if any, can

be recovered from these types of devices.

17.     Based on my knowledge, training, and experience, as well as information related

to me by agents and others involved in the forensic examination of digital devices, I know that

searching electronic devices can be a highly technical process that requires specific expertise and

specialized equipment.  There are so many types of electronic devices and software programs in

use today that specialized equipment is sometimes necessary to conduct a thorough search.  In

addition, it may be necessary to consult with specially trained personnel who have specific

expertise in the types of electronic devices, operating systems, or software applications that are

being searched.

18.     Furthermore, I am aware that electronic data is particularly vulnerable to

inadvertent or intentional modification or destruction.  Searching electronic devices can require

the use of precise, scientific procedures that are designed to maintain the integrity of electronic

data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a

result, a controlled environment, such as a law enforcement laboratory or similar facility, is

essential to conducting a complete and accurate analysis of data stored on electronic devices.

19.     Also, I know from my training and experience that the volume of data stored on

many electronic devices will typically be so large that it will often require a search of the device

in a law enforcement laboratory or similar facility.  A single megabyte of storage space is the

equivalent of 500 double-spaced pages of text.   A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.   Storage devices capable of storing 500 or more gigabytes are now commonplace.   Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.   Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

20.   I am also aware that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.   Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.   Normally, when a person deletes a file on an electronic device, the data contained in the file does not actually disappear; rather, that data remains until it is overwritten by new data.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, *i.e.,* space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.   In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.   Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.   The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.   Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and

13

computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

21. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), electronic devices can contain other forms of electronic evidence as well. In particular, records of how an electronic device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the electronic devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the electronic device was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time

14

22.     Further, evidence of how an electronic device has been used, what it has been used for, and who has used it, may be the absence of particular data on an electronic device.   For example, to rebut a claim that the owner of an electronic device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the electronic device remotely is not present on the electronic device.   Evidence of the absence of particular data on an electronic device is not segregable from the electronic device.   Analysis of the electronic device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

23.     Searching for the evidence described in Attachment B may require a range of data analysis techniques.   In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time consuming manual search through unrelated materials that may be co-mingled with criminal evidence.   In other cases, however, such techniques may not yield the evidence described in the warrant.   Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information.   These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant.   In light of these difficulties, the DEA intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

15

24. Given that the affidavit is in support of a search warrant for electronic devices, which are stored as evidence with the DEA, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

## FACTS ESTABLISHING PROBABLE CAUSE

25. Since this affidavit is being submitted for the limited purpose of obtaining a search, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts I believe are necessary to establish probable cause that Israel COLLADO-REYES utilized cellular phones, specifically the SUBJECT PHONES, to coordinate and further his drug trafficking activities. In this affidavit, your affiant refers to conversations from telephone calls. With regard to these conversations, several conditions apply. First, some conversations were in the Spanish language. Your affiant does not speak Spanish. However, Spanish translators employed by the DEA have listened to the conversations and prepared English language summaries or transcripts of their content. Second, the interpretations and analyses of the conversations described below are based upon the training and experience of your affiant and other law enforcement agents involved in this and other drug trafficking investigations.

26. Since July 2018, Special Agents and Task Force Officers (TFO) of DEA Philadelphia High Intensity Drug Trafficking Area Group 32 have been investigating the current drug trafficking activities of Israel COLLADO-REYES, FNU LNU, a/k/a "WILLY", Jose LOPEZ-ESPINAL, Ysmael ORTEGA-SEVERINO, Rafael CUSTODIO, Bernardo DIAZ DE LA CRUZ ("DIAZ"), Aneudy OTANEZ, and others.

16

27.     Your affiant makes this affidavit based upon the following: Your affiant's

personal observations; physical surveillance conducted by agents/officers of the DEA, Bensalem

Police Department, and Philadelphia Police Department which have been reported to the affiant

either directly or indirectly; oral and written reports about this and other investigations your

affiant has received, directly or indirectly, from agents and task force officers of the DEA,

Bensalem Police Department, and the Philadelphia Police Department; a review of telephone toll

records, pen register and trap and trace information, location information, physical surveillance;

the interception of numerous telephone calls and text messages between COLLADO-REYES,

DIAZ, Rafael CUSTODIO, Jose MELENDEZ-GONZALEZ, and others pursuant to a Title III

wiretap order issued by the United States District Court for the Eastern District of Pennsylvania.

On December 10, 2018, the Honorable Mitchell Goldberg signed a court order authorizing the

interception of wire and electronic communications occurring over telephone number (201) 737-

8815 (telephone number assigned to SUBJECT PHONE 1), utilized by COLLADO-REYES.

On January 9, 2019, the Honorable Michael M. Baylson signed a court order authorizing the

continued interception of wire and electronic communication occurring over the SUBJECT

PHONE 1, utilized by COLLADO-REYES.    On February 7, 2019, the Honorable Petrese B.

Tucker signed a court order authorizing the interception of wire communications occurring over

telephone number (917) 564-1603 (telephone number assigned to SUBJECT PHONE 2), utilized

by COLLADO-REYES.    On March 19, 2019, the Honorable Harvey Bartle III signed a court

order authorizing the interception of wire communications occurring over telephone number

(631) 402-7475 (telephone number assigned to SUBJECT PHONE 6), utilized by COLLADO-

REYES.    Investigative agents did not intercept any communications occurring over telephone

17

number (631) 402-7475 because COLLADO-REYES discontinued the use of the telephone prior to the authorized interception period. On April 4, 2019, the Honorable Michael M. Baylson signed a court order authorizing the interception of wire and electronic communications occurring over telephone number (516) 595-5845 (telephone number assigned to SUBJECT PHONE 3), utilized by COLLADO-REYES.

28. On December 13, 2018, at 3:38 p.m. EDT, telephone number (201) 737-8815 (SUBJECT PHONE 1), used by COLLADO-REYES, received an incoming telephone call from (215) 280-6241, utilized by Rafael CUSTODIO The following is an excerpt of the conversation:

| **CUSTODIO:** | I can dry it [U/I] because it is wet with salt. The water had salt. He told me if it is with salt, it has to be caustic soda. He told me everything, the amount I had to put into it. The guy told me everything. |
| **IC:** | Check that, keep it written down. |
| **CUSTODIO:** | That's one thing, also the guy proposed to me if he could come cook over here. |
| **IC:** | Hum. |
| **CUSTODIO:** | To bring that guy it costs 10 pesos. He is right now in Colombia. |
| **IC:** | Uh-hum. |
| **CUSTODIO:** | If we want to bring him, we can associate. The guy cooks... and we will be partners. |
| **IC:** | Uh-hum. |

Based your affiant's training, experience, and overall knowledge of this investigation, I believe that CUSTODIO told COLLADO-REYES he spoke with another individual who told him how to properly prepare drugs ("He told me if it is with salt, it has to be caustic soda. He

18

told me everything, the amount I had to put into it"). COLLADO-REYES instructed

CUSTODIO to write down those instructions ("Check that, keep it written down").

CUSTODIO stated the individual who instructed him on how to prepare the drugs offered to

come to Philadelphia and prepare the drugs for them ("the guy proposed to me if he could come

cook over here"). CUSTODIO explained that the individual is located in Colombia and will

charge $10,000 ("10 pesos") to come to Philadelphia to work for CUSTODIO's organization.

29.     On January 4, 2019, at 8:36 p.m. EDT, telephone number (201) 737-8815

(SUBJECT PHONE 1), used by COLLADO-REYES, received an incoming telephone call from

telephone number (215) 201-6726, utilized by Rafael CUSTODIO. The following is an excerpt

of the conversation:

| | |
|---|---|
| **CUSTODIO:** | I have a buddy that called me and told me that if... to give, to give him one and that he was going to front me 10 and that in 10 days he was going to pay the rest all at once. |
| **COLLADO:** | Yes. So, listen to what he told me. He said, "Look, I have something there. I'm going to tell you what we're going to do... and I told him, "Tell me". Eh, "do you have it here?" and I said, "No, I have it down there". He told me, "Look, send for... [Sniffs] send for seven (7) and I'll guarantee/ make sure that I'll make you one (1)". |
| **CUSTODIO:** | But, seven (7) what? |
| **COLLADO:** | Seven hundred pesos! |
| **CUSTODIO:** | Seven hundred pesos from what you have there? |
| **COLLADO:** | From the 900! |
| **CUSTODIO:** | But, there aren't 900 there, because you took... you sent for some. Remember.   You sent for some. |
| **COLLADO:** | And, when did I send for that?   [U/I] |

**CUSTODIO:**    Of course! You sent for some.   Remember.

**COLLADO:**    There was 1,000 and I sent for 100. Remember.

**CUSTODIO:**    The thing is that there's only 8-40 in there.   There wasn't 1,000 in there.

Based your affiant's training, experience, and overall knowledge of this investigation, I believe that CUSTODIO stated that he had a customer who wanted a kilogram of heroin and would pay $10,000 up front at the time he receives the kilogram and would pay the remainder within ten days of receipt of the heroin ("to give him one and that he was going to front me 10 and that in 10 days he was going to pay the rest all at once"). COLLADO-REYES stated that he spoke with an individual who would be able to take 700 grams of heroin from COLLADO-REYES and make it a full kilogram by adding a cutting agent ("Look, send for... [Sniffs] send for seven (7) and I'll guarantee/ make sure that I'll make you one (1)"). COLLADO-REYES explained that the 700 grams would come from the 900 grams that CUSTODIO had in his possession. CUSTODIO stated that they do not have 900 grams because COLLADO-REYES already provided some to another customer ("But, there aren't 900 there, because you took... you sent for some. Remember. You sent for some"). COLLADO-REYES stated that he originally provided CUSTODIO with 1,000 grams and he only provided 100 grams to a customer ("There was 1,000 and I sent for 100"). CUSTODIO claimed there were not 1,000 grams initially and that he only had 840 grams remaining ("there's only 8-40 in there. There wasn't 1,000 in there").

30. On February 9, 2019, at 12:38 p.m. EDT, telephone number (917) 564-1603 (SUBJECT PHONE 2), used by COLLADO-REYES, received an incoming telephone call from

20

telephone number (216) 298-7214, utilized by Ysmael ORTEGA-SEVERINO. The following is

an excerpt of the conversation:

**ORTEGA:** To talk to *cuña'o/ cuñado* [brother in law] because he, he... [Stammers] we were both angry, I will not lie to you. But, I won't take any returns from anybody after two (2) months, you know that I won't. [U/I]

[Voices overlap]

**COLLADO:** What did he say?

**ORTEGA:** He said that he is going to return what he owes me supposedly on that. (poss. product not $). I'm not going to grab anything back. I'm not going to grab anything back [from him] because I told him. I told him, "Israel told me that you're are a very serious person and I'm not going to question your word but what you gave me back has been changed. So, how is that I gave you something, something yellow and you're giving me something that it's white, it's not the same stuff. So now you're saying you're going to return something back to me again. I said, "no, no, no, forget that". I told him, I need the money, [Stutters] I don't need any of that anymore."

**COLLADO:** Uh... [Stutters] the 400 pesos?

**ORTEGA:** Of course.

Based on your affiant's training, experience, and overall knowledge of this investigation,

I believe that ORTEGA-SEVERINO told COLLADO-REYES he talked to Rafael CUSTODIO

("*cuña'o/ cuñado* – brother in law*")* about 400 grams of heroin ("400 pesos") that he previously

provided to CUSTODIO on credit. ORTEGA-SEVERINO explained that he does not accept

drug returns from customers after two months ("But, I won't take any returns from anybody after

two (2) months, you know that I won't"). ORTEGA-SEVERINO stated that although

CUSTODIO intended on returning the drugs that he received from ORTEGA-SEVERINO,

ORTEGA-SEVERINO was not going to accept their return ("I'm not going to grab anything

21

back"). ORTEGA-SEVERINO stated that he told CUSTODIO that he needed payment ("I need the money") for the drugs and did not want any of the heroin back ("So now you're saying you're going to return something back to me again. I said, 'no, no, no, forget that'").

31. On February 15, 2019, at 3:48 p.m. EDT, telephone number (917) 564-1603 (SUBJECT PHONE 2), used by COLLADO-REYES, placed an outgoing telephone call to telephone number (849) 751-2589, utilized by FNU LNU, a/k/a "UM2589". The following is an excerpt of the conversation:

| | |
|---|---|
| **COLLADO:** | We went... listen, we went to three (3) places. In two (2) places [out of the 3 places] they said that it was good and in the other one the guy said like, "ah-ah... whatever". I told him, "no, but" we said, "so". So, listen to what we've determined. [Sighs] He's... he's going to go and he's going to send there... he's going to, I mean, he's going send, a nephew that he has over there... [Sniffs]. |
| **UM:** | Mm-hm. |
| **COLLADO:** | ... with a couple of pictures so he can check them. [Sighs] Because you know that these people are tough cookies and then I don't want any problem/ issues. Do you know what I'm saying? |
| **UM:** | What do you mean tough cookies? |
| [Voices overlap] | |
| **COLLADO:** | Uh-huh. You know you know your *brother*. In other words, problems are the least that we want. [Sighs] Eh, he is going to send a couple of pictures and I told him, "But, send a couple of pictures over there, where you have these girls/ women dancing. There they will tell you... and if they say 'yes' then we don't have to be checking anything else". [Sniffs]. He said, "That's a good idea. That's true. It's much better and safe". [Sighs] So, he... how do I tell you? Either way I told him that I needed two (2) pesos because I needed to do some shit. [Sniffs] He's going to give it to me anyway. Do you... [Sniffs] do you |

22

have a... a bank account so you can get a 100,000 pesos [Poss. Dominican pesos] deposit?

Based on your affiant's training, experience, and overall knowledge of this investigation, I believe that COLLADO-REYES stated that he took samples of drugs to three different potential customers ("we went to three places"). COLLADO-REYES stated that of the three customers, two of the customers said the quality of the drugs were good, but that the third customer was not pleased ("In two (2) places [out of the 3 places] they said that it was good and in the other one the guy said like, 'ah-ah... whatever'"). COLLADO-REYES stated that the customer who was not pleased with the quality of the drugs was going to send the sample of drugs to another area ("mean, he's going send, a nephew that he has over there") to see if the drugs would be received better in that location ("with a couple of pictures so he can check them"). COLLADO-REYES stated he told the customer to send samples to the other location where the type of drug was commonly sold better ("send a couple of pictures over there, where you have these girls/ women dancing"). COLLADO-REYES stated he told the customer he needed $2,000 ("two pesos"). COLLADO-REYES then asked UM2589 if he had a bank account so that COLLADO-REYES could wire him 100,000 Dominican pesos ("Do you... [Sniffs] do you have a... a bank account so you can get a 100,000 pesos [Poss. Dominican pesos] deposit?").

32. Beginning on February 17, 2019, when COLLADO-REYES received or placed telephone calls over the SUBJECT PHONE 2, the individuals he spoke with could not understand what COLLADO-REYES was saying. Investigative agents could also not understand what COLLADO-REYES was stating over the intercepted communications and his voice was distorted. For example, on February 18, 2019, at 10:00 p.m., COLLADO-REYES,

23

utilizing the SUBJECT PHONE 2, placed an outgoing telephone call to telephone number (347) 833-2695, utilized by an unknown male ("UM2695"). During the telephone conversation, UM2695 could not understand COLLADO-REYES. After the call concluded, at 10:01 p.m., UM2695 received an incoming telephone call from the SUBJECT PHONE 6. According to toll analysis of telephone number (347) 833-2695, this was the first time UM2695 had contact with the SUBJECT PHONE 6. Your affiant believes that because UM2695 could not understand COLLADO-REYES, he concluded the phone conversation over the SUBJECT PHONE 2 and immediately called UM2695 over the SUBJECT PHONE 6.

33. Similarly, on February 18, 2019, COLLADO-REYES, utilizing the SUBJECT PHONE 2, placed an outgoing telephone call to DIAZ, who utilized telephone number (929) 239-8914. During the conversation, DIAZ could not understand COLLADO-REYES since his voice was distorted. After the call concluded, DIAZ's next incoming telephone call was from the SUBJECT PHONE 6. According to toll analysis of telephone number (929) 239-8914, this was the first time DIAZ had contact with the SUBJECT PHONE 6. Your affiant believes because DIAZ could not understand COLLADO-REYES over the SUBJECT PHONE 2, COLLADO-REYES then called DIAZ over the SUBJECT PHONE 6. Since the call from the SUBJECT PHONE 6 on February 18, 2019, DIAZ has not had contact with COLLADO-REYES over the SUBJECT PHONE 2. On February 21, 2019, at 11:35 p.m., investigative agents stopped receiving location information for the SUBJECT PHONE 2.

34. On March 19, 2019, the Honorable Harvey Bartle III, signed a court order authorizing the interception of wire communications occurring over the SUBJECT PHONE 6, utilized by COLLADO-REYES. Pursuant to the order, interceptions began on March 19, 2019.

24

Once the interception period began, agents did not intercept any live communications occurring over the SUBJECT PHONE 6.   Pen register data shows several incoming telephone calls that were unanswered and the calls immediately go to voicemail.   Toll analysis of the SUBJECT PHONE 6 shows from March 12 to March 14, 2019, COLLADO-REYES had approximately 71 telephonic exchanges.   Of the 71 telephonic exchanges, COLLADO-REYES only made three outgoing telephone calls to telephone numbers other than to his voicemail.   Based on agents not receiving any live communications since the interception period of the SUBJECT PHONE 6 began, in addition to toll analysis, your affiant believes COLLADO-REYES effectively discontinued the use of SUBJECT PHONE 6 on or about March 12, 2019.

35.   Pursuant to court-authorized pen register data provided for telephone number (929) 239-8914, utilized by DIAZ, on March 21, 2019, at 3:22 p.m., DIAZ placed a call to COLLADO-REYES over the SUBJECT PHONE 3.   Based on the duration of the call, your affiant believes COLLADO-REYES did not answer the call.   At 3:23 p.m., DIAZ then placed another call to COLLADO-REYES over the SUBJECT PHONE 3.   Based on the duration of the call, your affiant believes COLLADO-REYES did not answer the call.   At 3:23 p.m., DIAZ then placed an outgoing telephone call to the SUBJECT PHONE 6.   Based on the duration of the call, your affiant believes COLLADO-REYES did not answer the call.   At 3:25 p.m., DIAZ then placed an outgoing telephone call to COLLADO-REYES over the SUBJECT PHONE 3, which was answered.   Court-authorized location information for DIAZ's telephone around this time showed DIAZ had traveled to the area of 1131 Ogden Avenue, Bronx, NY where COLLADO-REYES resides.   Your affiant believes DIAZ first called COLLADO-REYES over the SUBJECT PHONE 3, but COLLADO-REYES did not answer.   DIAZ then attempted to call

25

COLLADO-REYES over the SUBJECT PHONE 6, which as previously stated, your affiant believes COLLADO-REYES had stopped using.   DIAZ then called COLLADO-REYES again over the SUBJECT PHONE 3, and COLLADO-REYES answered the call.   Your affiant believes DIAZ was calling COLLADO-REYES to tell him he had arrived at his apartment building.   On April 4, 2019, the Honorable Michael M. Baylson issued an Order authorizing the interception of wire and electronic communications over the SUBJECT PHONE 3.

36.      On April 23, 2019, at 2:36 p.m. EDT, telephone number (516) 595-5845 (SUBJECT PHONE 3), used by COLLADO-REYES, received an incoming telephone call from telephone number (860) 244-3823, utilized by Jose MELENDEZ, a/k/a "POTRO."   The following is an excerpt of the conversation:

**MELENDEZ:**    You understand? Well, I am going to..look ISRA, that girl is fucked up, for real, that girl, dude. Anyway, I am going to talk about that topic again, that's on the past anyway.

**COLLADO:**    Of course.

**MELENDEZ:**    But, listen to this I am going to bring you Five (5) pesos for 100, to then, give it to that girl dude.

**COLLADO:**    Okay, we do it like that. When are you coming?

**MELENDEZ:**    Well, let me see if I go today, you understand? because then..

**COLLADO:**    Not today,

**MELENDEZ:**    Not today? Tomorrow?

**COLLADO:**    It's better off tomorrow afternoon.

(Later in the conversation)

**MELENDEZ:**    Alright, alright. You understand? Listen, what color do you have the girls?

26

| | |
|---|---|
| **COLLADO:** | I mean, the same ones, the old one,   the one you like. |
| **MELENDEZ:** | No, no, but, which ones is it? Not the yellow one? Right? |
| **UM:** | [Background:  To the left cousin] |
| **COLLADO:** | Huh? |
| **MELENDEZ:** | Not the yellow one? |
| **COLLADO:** | No. White ones. |
| **MELENDEZ:** | Okay, okay, okay, okay. |

Based on your affiant's training, experience, and overall knowledge of this investigation, I believe that MELENDEZ-GONZALEZ told COLLADO-REYES he was going to bring him $5,000 for 100 grams of suspected fentanyl to mix with heroin MELENDEZ-GONZALEZ already had ("listen to this I am going to bring you Five (5) pesos for 100, to then, give it to that girl, dude").   COLLADO-REYES responded that he had the white-colored fentanyl, not the yellow-colored fentanyl ("No. White ones").

37.   On April 26, 2019, at 5:19 p.m. EDT, telephone number (516) 595-5845 (SUBJECT PHONE 3), used by COLLADO-REYES, received an incoming telephone call from telephone number (860) 244-3823, utilized by Jose MELENDEZ.   The following is a portion of the conversation:

| | |
|---|---|
| **MELENDEZ:** | ISRA! |
| **COLLADO:** | Hey! |
| **MELENDEZ:** | Dude, you gave me the same thing, dude.  Honestly, dude, nobody wants that, ISRA... dude.    You told me, "That one is PINK", dude.  Do you understand me? |

[Voices overlap]

27

**COLLADO:**          That's kind of PINK.

[Voices overlap]

**MELENDEZ:**          Dude, you told me it was either PINK or WHITISH.   But,
                      dude...

[Voices overlap]

**COLLADO:**          But...

**MELENDEZ:**          ... nobody wants that YELLOW stuff, dude.   And, buddy,
                      right now it was pouring rain over here and stuff.

Based on your affiant's training, experience, and overall knowledge of this investigation,
I believe that MELENDEZ told COLLADO-REYES that the fentanyl he received from
COLLADO-REYES on a previous date was supposed to be the fentanyl that was pink in color
("You told me, 'That one is PINK', dude.   Do you understand me?").   COLLADO-REYES
responded that the fentanyl was "kind of pink."   MELENDEZ stated the fentanyl was neither
pink or white and that it was yellow in color and none of his customers wanted that color
("nobody wants that YELLOW stuff, dude").

38.     On May 8, 2019, the Honorable Magistrate Judge Ona T. Wang of the Southern
District of New York signed a search and seizure warrant authorizing the investigative agents to
search the premises of 1131-1333 Ogden Avenue, Apt 13C, Bronx, NY.   The Honorable
Magistrate Judge Jacob P. Hart signed a Complaint and Warrant authorizing the arrest of Israel
COLLADO-REYES for conspiracy to distribute 100 grams or more of heroin.

39.     On May 9, 2019, DEA Group 32 agents, DEA New York Division agents, and
Special Narcotics Courts (SNC) executed the search warrant at 1131-1133 Ogden Avenue, Apt
13C, Bronx, NY where COLLADO-REYES resided.   During a search of the residence, agents

found suspected heroin, suspected fentanyl, suspected fentanyl pills, drug paraphernalia, US currency, drug ledgers, the SUBJECT PHONES, and other items, inside the back bedroom that was utilized by COLLADO-REYES.   Investigative agents transported the SUBJECT PHONES and other aforementioned items to the Philadelphia Field Division.   The SUBJECT PHONES are currently being held in temporary evidence storage at the Philadelphia Field Division.

40.   As previously mentioned, the IMEI numbers for SUBJECT PHONE 1, SUBJECT PHONE 2, SUBJECT PHONE 3, and SUBJECT PHONE 6, match the IMEI numbers associated with telephone numbers utilized by COLLADO-REYES that investigative agents received court authorization to intercept.   SUBJECT PHONE 5 was assigned telephone number (917) 635-6474, which was previously identified as phone number used by COLLADO-REYES in July and August 2018, based on toll analysis, court-authorized location information for the telephone number, and physical surveillance.   For example, on July 24, 2018, investigative agents conducted surveillance of COLLADO-REYES based on location information provided by SUBJECT PHONE 5.   Investigative agents followed COLLADO-REYES to Harbor Freight Tools in Philadelphia, PA where they observed him purchase a hydraulic press.   Based on your affiant's training and experience, I know that drug traffickers commonly utilize hydraulic presses to press drugs in to kilogram quantities for further distribution.   The location information for the SUBJECT PHONE 5 corresponded with COLLADO-REYES's movements to and from the Harbor Freight Tools.   Toll analysis shows that COLLADO-REYES utilized the telephone number associated with SUBJECT PHONE 5 to communicate with drug customers, couriers, and suppliers, including DIAZ and Aneudy OTANEZ.   Toll analysis of the telephone number associated with SUBJECT PHONE 4, indicates COLLADO-REYES also utilized SUBJECT

29

PHONE 4 to communicate with drug associates, including DIAZ and MELENDEZ.   The

SUBJECT PHONE 7 was located along with SUBJECT PHONES 1 thorough 6 in COLLADO's

bedroom, along with the suspected narcotics and narcotics paraphernalia.   Toll analysis and

court authorized interceptions of communications occurring over telephones used by

COLLADO-REYES, and others, have shown that COLLADO-REYES regularly utilizes

cellphones to communicate with drug suppliers, customers, and couriers.   Since COLLADO

utilized SUBJECT PHONES 1 through 6 to facilitate drug trafficking offenses, it is believed that

the SUBJECT PHONE 7 was also used as part of conspiracy to commit narcotics violations, and

that evidence of violations of Title 21, United States Code, Sections 841, 846(a)(1), will also be

located on the SUBJECT PHONE 7.

## **CONCLUSION**

41.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Devices described in Attachment A to seek the items

described in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief, and that this declaration was executed on

May 22, 2019.

Travis Campbell
Special Agent
Drug Enforcement Administration

LINDA K. CARACAPPA
United States Magistrate Judge

31